# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:21-cr-20198-JPM |
| ) | |
| JEROME EWING, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Jerome Ewing's Motion to Suppress, filed February 25, 2022. (ECF No. 37.) District Judge Jon P. McCalla referred the motion to the undersigned for report and recommendation. (ECF No. 38.) The United States responded in opposition on April 12, 2022. (ECF No. 89.)

The Court held a hearing on the motion on May 18, 2022. (ECF No. 54.) At the hearing, the United States called two witnesses, Probation Officer Jody Poole and Detective Brett Neas, and introduced into evidence four exhibits: a State of Tennessee probation order dated March 5, 2019 (Exhibit 1), a Google Maps image (Exhibit 4), and two photographic exhibits (Exhibits 5 and 6). Ewing testified, calling no other witnesses, and introduced two photographic exhibits (Exhibits 2 and 3).

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this Court recommends that the motion be denied.

## **PROPOSED FINDINGS OF FACT**

The following proposed facts are taken from the sworn testimony presented at the suppression hearing. Where factual conflicts were presented, these facts represent the undersigned's resolution of those conflicts after considering the credibility of the witness and supporting evidence.

Officer Jody Poole has been a probation officer with the Tennessee Department of Corrections ("TDOC") for three years. (Tr. 3.) Though TDOC covers probation and parole, Poole only handles probation cases and acknowledged that parole cases are a little different. (*Id.* at 11.) She was assigned to supervise Ewing's probation in October 2020. (*Id.* at 4.) Ewing was convicted of criminal attempt of possession of a controlled substance (heroin) with intent to manufacture, deliver, or sell on March 5, 2019. (Ex. 1.)[1] That supervision was pursuant to the probation order entered as Exhibit 1, signed by Ewing and a judge, which provides, inter alia:

> I will allow my Probation Officer to visit my home, employment site, or elsewhere, will carry out all instructions he or she gives; will report to my Probation Officer as instructed; will comply with mandates of the Administrative Case Review Committee, if the use of that process is approved by the Court; will comply with referral to Resource Center Programs, if available, by attending; and will submit to electronic monitoring and community service, if required.
>
> I agree to search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or laws [sic] enforcement officer, at any time.

(*Id.* ¶¶ 6, 7.) Poole testified that those provisions allow for a search of Ewing's residence and car without a warrant and without suspicion. (Tr. 7, 18.)

In April 2021, Poole "got wind" that Ewing was selling drugs from his mother's house, where he was living, at 2693 Beechmont Street. (*Id.* at 7–8.) An operation was thus planned to

---

[1] The United States confirmed at the hearing that Exhibit 1 is the same as the document filed on the docket at ECF No. 49-1.

investigate the allegations, comprising Poole, her partner Clay, agents from Homeland Security, and officers from the Memphis Police Department Drug Unit. (*Id.* at 8.) The operation team met before and went to Ewing's residence together. (*Id.* at 23.) As planned, Poole and Clay drove up to 2693 Beechmont in a marked TDOC car and parked in front, with Poole in the passenger seat, while the other officers took surveillance positions nearby. (*Id.* at 8–9, 12, 21, 23, 27.)

At the time, Poole was operating under Covid protocols that required her to be careful, maintain distancing, and wear a mask. (*Id.* at 11–12.) As a result, she would sometimes interview probationers outside, at their front door, without going into their homes. (*Id.* at 12.) She had previously interviewed Ewing outside. (*Id.* at 13.) She did not interview probationers in her car. (*Id.* at 12.)

When Poole and Clay pulled up to the house, they did not see Ewing, so Poole called Ewing's telephone. (*Id.* at 8, 13.) Ewing answered, and Poole told him she was there. (*Id.* at 8, 14.) Ewing responded, "I'm here, Officer Poole." (*Id.* at 9, 14.) According to Poole, she told Ewing to come outside, and he emerged from the driver's side of a 2017 Dodge Challenger parked in his neighbor's driveway at 2695 Beechmont. (*Id.*) No one else was in the Challenger. (*Id.* at 9.) Poole got out of her car and told Ewing to come toward her, which he did, and at that point the rest of the officers came to the house, and Ewing was arrested. (*Id.* at 9, 14, 17.)

Exhibit 2 depicts an image of 2693 Beechmont, Ewing's home. (Ex. 2; Tr. 15.) The image shows a one-story brick house painted blue, with unpainted red brick on the right corner of the home and a window with red shutters. (Ex. 2.) The house number 2693 is visible on the roofline. (*Id.*) To the right of the house are two cars parked in a row (the car closest to the house being a dark-colored Mercedes, and only the front bumper of the car behind it visible), to the

3

right of those cars can be seen another parked car, and beyond it, a neighboring house sided in tan fieldstone. (*Id.*)

Exhibit 3 depicts an image of the right side of 2693 Beechmont, with its unpainted red brick corner and side, and the neighboring tan stone house at 2695 Beechmont. (Ex. 3; Tr. 16.) Two parallel, concrete driveways fill the space between the homes, with a narrow strip of grass separating the driveways. (Ex. 3.) In the driveway on the left, belonging to 2693, the image shows the dark-colored Mercedes, parked in front of a white, two-door car, parked in front of another car, only the front wheel of which is visible. (*Id.*) In the driveway on the right, belonging to 2695, the image shows a dark-colored SUV parked near the house and behind it, in the foreground, the black Challenger, with the driver's side door open. (*Id.*) The house number 2695 is visible above the tan house's front door, which is covered by a gabled portico supported by two brown posts. (*Id.*) The photograph in Exhibit 3 was taken after Ewing's arrest. (Tr. 17.)

Following Ewing's arrest, some of the officers searched the Challenger and located narcotics and a weapon. (*Id.* at 35.) Poole testified that the probation order gave her authority to search the Challenger because Ewing was in the driver's seat. (*Id.* at 18.) Poole agreed on cross examination that she had to have some reason to believe the car was Ewing's or that he regularly drove it. (*Id.* at 19.) She did not know who the Challenger was registered to but said it did not matter because Ewing was in the driver's seat. (*Id.* at 22.) She did not participate in the search of the Challenger. (*Id.* at 17.)

Detective Brett Neas was, at the time, a detective with the Shelby County Sheriff's Office, assigned to the Multi-Agency Gang Unit's ("MGU") NIBIN unit.[2] (*Id.* at 25.) The role of the MGU is to address violent crime, working jointly with several federal agencies. (*Id.* at

---

[2] Neas is currently assigned to the PSN unit. (*Id.* at 25.)

4

25–26.) Neas had been in law enforcement for fourteen years in 2021 and had attended the police academy and received on-the-job training. (*Id.* at 26.)

Neas was asked to participate in a probation check on Ewing on April 9, 2021. (*Id.* at 26.) He attended the meeting before the operation, where different officers were assigned different roles, and he was assigned to surveillance. (*Id.* at 26–27.) His job was to conduct discreet observation of the residence at 2693 Beechmont to gather as much information as possible. (*Id.* at 27.) Neas was given a photograph of Ewing so that he would know who to look for. (*Id.* at 30–31.) During the operation, Neas was parked in an undercover car on Lynwood Avenue, east of Overton Crossing Street, with a clear line of sight of 2693 Beechmont. (*Id.* at 28.)

Exhibit 4 depicts an aerial image from Google Maps of 2693 Beechmont and the surrounding neighborhood, which Neas described as an older neighborhood with a lot of trees. (Ex. 4; Tr. 28, 36.) The location of 2693 Beechmont is identified with a red marker. (Ex. 4.) The home is near the termination of Beechmont into Overton Crossing; it appears that 2693 is the second home on Beechmont off Overton Crossing. (*Id.*) During the hearing, Neas indicated on Exhibit 4 where he was parked; the location was on the curved part of Lynwood, the next street over and across from Beechmont, just before it terminates into Overton Crossing. (Tr. 31–32, 36; Ex. 4.) The block between Beechmont, which terminates into the left of Overton Crossing, and Lynwood, which terminates into the right of Overton Crossing, appears to have two houses on each side of Overton Crossing. (Ex. 4.) Exhibit 4 supports Neas's testimony that his view of 2693 Beechmont was unimpeded from his location on Lynwood, based on the curvature of Beechmont and Lynwood and on the lack of trees or structures in the block between. (*Id.*)

5

Exhibits 5 and 6 depict images taken by Neas to demonstrate his view of 2693 Beechmont. (Tr. 28–29.) Neas did not take the photographs the day of the operation—he took them "more recently"—but he took the photographs from approximately the same location where he conducted surveillance on April 9, 2021. (*Id.* at 33, 44.) The images show 2693 and 2695 Beechmont through the rear window of Neas's car. (*Id.* at 34.) Exhibit 6 demonstrates that Neas's line of sight to 2693 and 2695 Beechmont is unobstructed. (Ex. 6.) Exhibit 5 appears to be a magnified version of Exhibit 6 and shows the blue brick 2693 Beechmont on the left, with its red brick right corner and red shutters on the windows. (Ex. 5.) The driveways between 2693 and 2695 are visible as well. (*Id.*) The home to the right of the driveways, identified by Neas as 2695 Beechmont, appears gray with white trim. (*Id.*; Tr. 32–33, 39.) Neas testified that the color of 2695 Beechmont has changed since April 2021. (Tr. 44.) The house on the right in Exhibit 5 has the same gabled portico as the house identified as 2695 Beechmont in Exhibit 3, though the portico depicted in Exhibit 5 is painted white. (Ex. 3; Ex. 5.)

Neas testified that, immediately after the probation officers pulled up in front of Ewing's home, Ewing exited the Challenger parked in the driveway of 2695 Beechmont. (*Id.* at 33, 39.) Neas was surveilling the house with binoculars, which aided his ability to see Ewing. (*Id.* at 33.) Neas saw Ewing approach the probation officers and saw the other officers arrive on the scene, at which point Neas also made the scene. (*Id.* at 34–35.)

Neas participated in the recovery of the weapon and narcotics from the Challenger. (*Id.* at 35.) He completed the incident report after the operation on the laptop in his car.[3] (*Id.* at 40–41.) Though the incident report says officers were responding to a weapons law violation, that

---

[3] Though the incident report was referred to in questioning and testimony, it was not provided to the Court nor offered into evidence.

field is auto-populated by the Watson system.  (*Id.* at 41–42.)  Neas did not recall if he ran the temporary tags on the Challenger to determine who it was registered to, but he knows it was not registered to Ewing.  (*Id.* at 42.)  Neas believed the Challenger was registered to a female but did not remember her name.  (*Id.*)

Ewing testified that, when Officer Poole called him, he was in his house, 2693 Beechmont, not in the Challenger.  (*Id.* at 47.)  He exited his home through the side door and walked straight down the driveway toward Poole.  (*Id.* at 47–48.)  Poole remained in her car as he approached, which was unusual for their interactions.  (*Id.* at 48.)

Ewing testified that he was not driving the Challenger, and, though he'd seen it before, he had never driven the Challenger.  (*Id.* at 49.)  The Challenger is owned by his sister, who bought it but needed to get it fixed.  (*Id.* at 49–50.)  Ewing did not know who parked the Challenger in the driveway of 2695 Beechmont.  (*Id.* at 50.)  He said that he did not know who the evidence collected from the Challenger belonged to, but it did not belong to him.  (*Id.* at 51.)  Ewing also testified that 2695 Beechmont was not vacant.  (*Id.* at 49.)  Ewing maintained that Poole and Neas were not truthful in their testimony that they saw him get out of the Challenger.  (*Id.* at 51–52.)

## PROPOSED CONCLUSIONS OF LAW

Ewing seeks suppression of the evidence found in the Challenger on the grounds that the search was unlawful.  Because the parties present diametrically opposed versions of the events surrounding the search, the Court first makes a determination of the credibility of the witnesses.  The Court then reviews applicable law and concludes that Ewing lacks standing to contest the search of the Challenger.  Finally, the Court finds the good-faith exception inapplicable in this case.

I.     **The Credibility of the Witnesses**

The threshold issue is whether to credit the testimony of Officer Poole and Detective Neas over that of Ewing regarding Ewing's association with the Challenger. Ewing testified that he was not in the Challenger when Poole called him and instead that he walked out of his house and straight down the driveway to her car. In contrast, Poole and Neas both testified that they saw Ewing get out of the driver's side of the Challenger before walking toward Poole.

The Court is given "wide latitude" in making its witness credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Vaughn*, 429 F. Supp. 3d 499, 529 (E.D. Tenn. 2019) (quoting *United States v. Caldwell*, No. 1:13-cr-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015)).

This Court finds both government witnesses in this case credible based on their demeanor and the readiness and certainty of their responses. In addition, Poole and Neas testified consistently with one another, providing virtually identical accounts of the events surrounding the encounter with Ewing on April 9, 2021. Poole was able to see Ewing get out of the Challenger from her position in front of his home, and Neas was surveilling through binoculars when he saw Ewing exit the Challenger. Their testimony is more credible than that of Ewing, who stated that the Challenger belongs to his sister and that he did not know who parked it in the neighbor's driveway or who the contraband found in the Challenger belonged to.

At the hearing, Ewing challenged the credibility of Neas, arguing that it seems impossible for him to have seen what he claims. On the contrary, however, Neas's testimony is supported by the photographic evidence submitted. Neas testified that he took the photographs submitted

as Exhibits 5 and 6 from inside his vehicle parked in the same location as he occupied when surveilling 2693 Beechmont in April 2021.[4] Though defense counsel suggested he would have had to peer through large trees and backyards to see 2693 Beechmont from his position, Neas credibly testified that he had a clear line of sight. His testimony is supported by the aerial map submitted as Exhibit 4, which shows that Neas likely had full view of 2693 Beechmont from his location at the curve of Lynwood before it intersects with Overton Crossing. The Court thus credits the consistent, credible testimony of Poole and Neas over the less credible testimony of Ewing.

## II.   Warrantless Searches of Probationers

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 560–61 (6th Cir. 2018)). "When law enforcement officials have acted unreasonably, the exclusionary rule exists to suppress evidence gained through

---

[4] Defense counsel questioned whether Neas was correct that Exhibits 5 and 6 portray the same angle of 2693 Beechmont as Exhibits 2 and 3, noting that the house to the right (2695 Beechmont) appears to have tan, stone siding in Exhibits 2 and 3 but is gray in Exhibits 5 and 6. Neas testified that the photographs in Exhibits 5 and 6 were taken at a later date, however, and that the appearance of 2695 has changed since April 2021. Based on the Court's comparison of Exhibits 2 and 3 to Exhibits 5 and 6, it appears that the exhibits represent what Neas said they do—photographs of the front, street view of 2693 and 2695 Beechmont taken on April 9, 2021, and photographs of the same view taken later, after 2695 Beechmont had been painted gray and undergone other renovations.

unconstitutional means." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (citing, e.g., *Nix v. Williams*, 467 U.S. 431, 443 (1984)). "The government has the burden of proving the legality of a warrantless search." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (citing *Haynes*, 301 F.3d at 677).

The "touchstone of the Fourth Amendment is reasonableness," based on the totality of the circumstances, "and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). A defendant's "status as a probationer subject to a search condition informs both sides of that balance." *Id.*; *see also id.* (finding a defendant's agreement to a probation search condition to be a "salient circumstance" in the totality-of-the-circumstances analysis). As to the privacy interest, a probationer's reasonable expectation of privacy is "significantly diminished" because probationers "do not enjoy 'the absolute liberty to which every citizen is entitled,'" particularly where the probationer is "unambiguously informed" of a "clearly expressed" search condition. *Id.* at 119–20 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). As to the governmental interest, a "probationer 'is more likely than the ordinary citizen to violate the law'" and has "even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware" that they have fewer rights in revocation proceedings. *Id.* at 120 (quoting *Griffin*, 483 U.S. at 880; citing *Minnesota v. Murphy*, 465 U.S. 420, 435 n.7 (1984); 18 U.S.C. § 3583(e)).

In balancing those interests in *Knights*, the Supreme Court held that, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121. Similarly, in balancing those interests in the context of a search of a parolee, who has "fewer expectations of privacy than probationers,"[5] the Supreme Court has found no Fourth Amendment violation in a search with no suspicion of criminal activity at all. *Samson v. California*, 547 U.S. 843, 856 (2006).

The Sixth Circuit has extended *Knights* and *Samson* to find that "a probationer whose probation order contains a search condition may be subjected to a search in the absence of reasonable suspicion." *United States v. Tessier*, 814 F.3d 432, 433 (6th Cir. 2016) ("adopt[ing] the district court's reasoning, which fully supports upholding the search"). The *Tessier* district court analyzed the totality of the circumstances and found that the diminished privacy interest and heightened governmental interest discussed in *Knights* were present in that case as well. *United States v. Tessier*, No. 3:13-00077, 2014 WL 4851688, at *7–8 (M.D. Tenn. Sept. 29, 2014), *aff'd*, 814 F.3d 432; *see also United States v. Brown*, 832 F. App'x 397, 400 (6th Cir. 2020) (affirming the denial of a motion to suppress "based on the totality of the circumstances and the terms and conditions of the" defendant's parole certificate). Though the search condition in *Tessier* did not include the *Knights* language that permitted a search "with or without reasonable cause," the court found that the "logical reading" of the defendant's agreement to a search "without a warrant" was that "no warrant will be required" and was meant to inform the

---

[5] A probationer's expectation of privacy, though reduced, "is greater than that of a parolee and of someone on supervised release." *United States v. Fletcher*, 978 F.3d 1009, 1018 (6th Cir. 2020) (citing *Samson*, 547 U.S. at 850; *United States v. Sulik*, 807 F. App'x 489, 493 (6th Cir. 2020)).

defendant "that judicial preview is not necessary before a search may occur." 2014 WL 4851688, at *7 (citing *State v. Turner*, 297 S.W.3d 155, 168 n.12 (Tenn. 2009)). Thus, the district court denied Tessier's motion to suppress, finding that the suspicionless search of a probationer subject to a search condition did not violate the Fourth Amendment.

### III. Ewing's Fourth Amendment Challenge

Given the facts as found by the Court that Ewing was sitting in the Challenger when Officer Poole pulled up to his house, the next inquiry is whether the search of the Challenger was constitutionally valid. Under *Tessier*, officers may search a probationer subject to a search condition with or without reasonable suspicion of wrongdoing. 814 F.3d at 433. Here, as in *Tessier*, Ewing was on probation with the State of Tennessee and clearly and unambiguously agreed in his probation order "to search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or laws [sic] enforcement officer, at any time."[6] (ECF No. 49-1 ¶ 7.) The diminished privacy interest and heightened governmental interest recognized in *Tessier* also exist in this case. The sole distinction is the underlying crime—in *Tessier*, the defendant was convicted of sexual exploitation of a minor, whereas here, Ewing's conviction was for criminal attempt of possession of heroin with the intent to manufacture, deliver, or sell it. (*See* Ex. 1.) Notwithstanding that difference, the governmental interest in protecting the community from drug trafficking is significant and weighs similarly in

---

[6] At the hearing, Ewing's counsel urged the Court to consider the concurrence in *Tessier*, which highlighted language in the probation order that stated: "I understand that if I do not agree with any condition, I have a right to petition the Sentencing Court for a modification." *See* 814 F.3d at 436. Ewing's probation order contains no such language. (ECF No. 49-1.) The *Tessier* concurrence focused on that language, however, as evidence of consent to the search, which the concurrence proposed as an alternative ground to affirm the district court.

12

the reasonableness consideration. *Tessier* thus governs and mandates a finding that the officers had authority to search Ewing and his property pursuant to the search condition.

The question remains, however, whether the search of the Challenger falls within that authority. The United States argues that Ewing's mere presence in the driver's seat brings the search of the Challenger within the scope of the search condition, and Ewing does not directly contest that position.[7] But the search condition expressly permits searches of "my . . . vehicle," and it is undisputed that Ewing did not own the Challenger. Resolution of this issue is not necessary in this case, however, as Ewing has not established that he has standing to challenge the search.[8]

"Fourth Amendment rights are said to be 'personal,'" and "[s]o a defendant must show that 'his own' rights were 'infringed.'" *Russell*, 26 F.4th at 374 (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978); *Byrd v. United States*, 584 U.S. –, 138 S. Ct. 1518, 1526 (2018)). "Courts use 'standing' as a 'shorthand' for this requirement." *Id.* (quoting *Byrd*, 138 S. Ct. at 1530).

---

[7] Ewing focuses instead on his contention that he was never in the Challenger and thus that "[t]here is no legitimate governmental interest served in allowing law enforcement officers to search vehicles parked in random driveways that just happen to be located near a probationer's home." (ECF No. 37, at 5.) Ewing is correct that the Sixth Circuit has "not address[ed] the question of whether a search of a probationer's home that has no legitimate law enforcement or probationary purpose—such as a search with no purpose other than to harass the probationer—would be reasonable under the Fourth Amendment." *Tessier*, 814 F.3d at 435. But because the Court has made the factual finding that Ewing was sitting in the Challenger, that argument is unavailing. The Challenger was not an unoccupied vehicle parked in a random neighbor's driveway; it was a vehicle occupied by Ewing when the police arrived.

[8] The United States has not argued that Ewing lacks standing to argue his Fourth Amendment rights were violated by the search, but that omission does not preclude the Court's *sua sponte* consideration of the issue. *See United States v. Russell*, 26 F.4th 371 (6th Cir. 2022) (finding the government's failure to object to standing before the district court was a forfeiture, not a waiver, and thus applying a plain-error standard in affirming the district court's *sua sponte* ruling of no standing). "Standing is 'an element' of a Fourth Amendment suppression claim" that the defendant bears the burden of establishing, regardless of whether the United States raises the issue. *Id.* at 376.

"[A] defendant has standing only if he has a Fourth Amendment interest in the property searched," which "can either be a property or a privacy interest." *Id.* at 377 (citing *Byrd*, 138 S. Ct. at 1530). "[W]e must determine first, whether he had an actual, subjective expectation of privacy, and second, whether that expectation was a legitimate, objectively reasonable expectation." *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)). The defendant bears the "burden of establishing standing to assert a Fourth Amendment violation." *Id.* (citing, e.g., *United States v. Salvucci*, 448 U.S. 83, 86 (1980)).

Here, Ewing establishes neither a subjective nor objectively reasonable expectation of privacy in the Challenger. According to Ewing, his sister owns the Challenger, which he has never driven. He did not know who parked the Challenger in the driveway or who owned the weapon or narcotics found inside. The Challenger was not running at the time. (ECF No. 37, at 2.) If Ewing's assertion that he was not sitting in the Challenger that day is to be believed, then he certainly had no property or privacy interest in it that would support his standing to seek suppression of the evidence found inside it. But even under the facts as found by the Court—that Ewing was inside the Challenger—he cannot establish standing when he was merely sitting in the driver's seat of the car he does not own while parked in his neighbor's driveway. *See, e.g.*, *United States v. Taylor*, 496 F. Supp. 2d 852, 857 (S.D. Ohio 2006) ("[A]n individual does not have a reasonable expectation of privacy in a vehicle, merely because he is its driver. Rather, the driver must demonstrate that he obtained possession from the owner of the vehicle or someone authorized by the owner to give him possession of the vehicle."). Ewing has not offered any evidence to show that he was permitted to use the Challenger, that he possessed the keys, or that he was otherwise in control of the Challenger. He has therefore identified no property interest in

or subjective expectation of privacy as to the Challenger, much less one that society would view as objectively reasonable. As such, Ewing lacks standing to challenge the search.[9]

## IV. The Good-Faith Exception

In the event Ewing is deemed to have standing to assert his Fourth Amendment claim and the search of the Challenger is deemed unreasonable under the totality of the circumstances,[10] the United States argues in the alternative that the good-faith exception to the exclusionary rule applies. Under that exception, "even if the search warrant were found to be fatally defective, the evidence would not be suppressed 'if the seizure was based on reasonable, good faith reliance on the warrant.'" *United States v. Hill*, 27 F.4th 1155, 1192 (6th Cir. 2022) (quoting *United States v. Abboud*, 438 F.3d 554, 578 (6th Cir. 2006)). "The 'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *Id.* (quoting *United States v.*

---

[9] It appears, in any event, that the ownership analysis largely dovetails with the standing analysis. Ewing either has a sufficient interest in the Challenger to bring the search of it within the scope of the search condition, rendering the search authorized, or he lacks sufficient interest in the Challenger to demonstrate that his own Fourth Amendment rights were violated, rendering him without standing. *See, e.g.*, *United States v. Meaux*, No. 17-CR-00179, 2017 WL 5492499, at *3 (W.D. La. Oct. 27, 2017), *report and recommendation adopted*, No. 17-CR-00179, 2017 WL 5492475 (W.D. La. Nov. 15, 2017), *aff'd*, 797 F. App'x 892 (5th Cir. 2020) (interpreting a parole condition to "extend[] to any vehicle [in the defendant's] possession and control where he could assert a reasonable expectation of privacy as if he was the owner of the vehicle" and finding that the defendant's "standing to challenge the constitutionality of the search essentially defeats his argument" that the borrowed car he was driving was not within the scope of the search condition); *United States v. Elam*, No. CR 03-0565 ABC, 2013 WL 12234152, at *4 (C.D. Cal. Mar. 4, 2013) ("Defendant's counsel could not have argued at that stage that Defendant did not possess the Camry because, if that were true, he would have lacked standing to object to the search in the first place."). *But see United States v. Dixon*, 984 F.3d 814, 822 (9th Cir. 2020) ("[B]efore conducting a warrantless search of a vehicle pursuant to a supervised release condition, law enforcement must have probable cause to believe that the supervisee owns or controls the vehicle to be searched.").

[10] The United States conceded at the hearing that, if the Court concluded that the officers did not see Ewing sitting in the Challenger, the good faith exception would not apply. (Tr. 55.)

*Leon*, 468 U.S. 897, 922–23 (1984)).  "[T]he burden rests on the government to prove that [the executing officer's] reliance on a warrant was objectively reasonable." *United States v. Linares*, No. 13-20368, 2015 WL 3870959, at *9 (E.D. Mich. May 4, 2015) (quoting *United States v. Rissew*, 580 F. App'x 35, 36 (2d Cir. 2014)).

Of course, there was no warrant issued in this case.  The United States instead asserts the officers in this case "reasonably relied on Ewing's signed probation order, and they searched Ewing's vehicle based on that written probation order." (ECF No. 49, at 6.)  In other words, the United States argues that the *Leon* exception applies to the officers' good-faith reliance on a probation search condition in the absence of a warrant.

The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing, e.g., *Herring v. United States*, 555 U.S. 135, 141 (2009)).  Its operation is thus limited "to situations in which this purpose is 'thought most efficaciously served.'  Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974); *United States v. Janis*, 428 U.S. 433, 454 (1976)).  In addition to deterrence, "[t]he analysis must also account for the 'substantial social costs' generated by the rule," which "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (quoting *Leon*, 468 U.S. at 907).  Thus, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* (citing *Herring*, 555 U.S. at 141; *Leon*, 468 U.S. 910).

That "cost-benefit analysis" focuses on "the 'flagrancy of the police misconduct' at issue." *Id.* at 238 (quoting *Leon*, 468 U.S. at 909).  "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of

16

exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). "But when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, . . . the 'deterrence rationale loses much of its force' . . . ." *Id.* (quoting *Leon*, 468 U.S. at 919). Where, for example, the police conducted a search in reliance on subsequently invalidated statutes, erroneous information in a database maintained by judicial employees, erroneous information in a police database, and subsequently overruled binding judicial precedent, the police "lack[ed] the culpability required to justify the harsh sanction of exclusion." *Id.* at 239 (citing *Illinois v. Krull*, 480 U.S. 340 (1987); *Arizona v. Evans*, 514 U.S. 1 (1995); *Herring*, 555 U.S. 135); *see also id.* at 240 ("Indeed, in 27 years of practice under Leon's good-faith exception, we have never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct.") (quotation omitted).

Neither the Supreme Court nor the Sixth Circuit has ruled on whether the good-faith exception can apply to officers' inappropriate reliance on a probation search condition to conduct a warrantless search of a probationer without suspicion of illegal activity. Given the Sixth Circuit's adoption in *Tessier* of a totality-of-the-circumstances test for this type of search, however, application of the good-faith exception appears inappropriate. "[C]ourts have concluded that the good faith exception is generally inapplicable to warrantless searches besides those types of warrantless searches identified in *Krull* and *Evans*." *United States v. Barclay*, No. 2:10-CR-20570, 2011 WL 1595065, at *5 n.5 (E.D. Mich. Mar. 21, 2011) (citing *United States v. Herrera*, 444 F.3d 1238, 1251 (10th Cir. 2006); *United States v. Curzi*, 867 F.2d 36, 44 (1st Cir. 1989); *United States v. Winsor*, 846 F.2d 1569, 1579 (9th Cir. 1988) (en banc); *United States v. Morgan*, 743 F.2d 1158, 1165 (6th Cir. 1984)). "[N]o objectively reasonable officer could believe a search to be valid where there is no objectively reasonable" basis for that belief. *Id.*;

17

*see also United States v. Stokely*, 733 F. Supp. 2d 868, 906 (E.D. Tenn. 2010) (finding that the officers unlawfully detained the defendant based on their "assessment that such detention was necessary and legal," which is the type of "deliberate action of law enforcement . . . that could be deterred by exclusion of the evidence"). Thus, if the officers' search of the Challenger is deemed unreasonable based on the totality of the circumstances, they could not have been objectively reasonable in believing the search was reasonable, and the good-faith exception would not save the evidence obtained from the Challenger from suppression.

## RECOMMENDATION

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 20th day of May, 2022.

s/Annie T. Christoff  
ANNIE T. CHRISTOFF  
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59 (b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.