**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cr-20198-JPM |
| | ) | |
| JEROME EWING, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ADOPTING IN PART AND REVERSING IN PART REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS**

Before the Court is the Report and Recommendation on Motion to Suppress of United States Magistrate Annie T. Christoff, filed on May 20, 2022 (ECF No. 55) with respect to Defendant Jerome Ewing's Motion to Suppress, filed on February 25, 2022 (ECF No. 37). The Magistrate Judge recommends that the Court deny Defendant's Motion. (ECF No. 55 at PageID 95.) Defendant Ewing filed timely objections to the Magistrate Judge's Report on June 16, 2022. (ECF No. 65.) The United States of America ("the Government") filed a Response to Defendant's Objections on June 23, 2022. (ECF No. 66.)

Upon de novo review, the Court ADOPTS the portion of the Report and Recommendation finding that Defendant was sitting in the Dodge Challenger and had consented in his State of Tennessee Probation Order to the search of the automobile in question. The Court REVERSES the Report and Recommendation insofar as it finds that Defendant does not have standing. Defendant's Motion to Suppress is DENIED.

## I.      BACKGROUND

On March 5, 2019, Defendant was convicted in Tennessee state court of possession of a controlled substance (heroin) with the intent to manufacture, deliver, or sell.  (Probation Order, ECF No. 49-1.)  He was sentenced to 6 years of probation.  (Id.)  The Probation Order, which Defendant acknowledges that he signed, states, "I agree to search, without a warrant, of my person, vehicle, property, or place of residence by any Probation / Parole officer or laws enforcement officer, at any time."  (ECF No. 49-1 ¶ 7; ECF No. 37 at PageID 65.)  It further provides, "I have read or have had read to me the Probation Order and the conditions of my Probation.  I fully understand them and agree to comply with such conditions during the period of my Probation." (ECF No. 49-1.)  On April 9, 2021,[1] law enforcement conducted a vehicle search of a 2017 Dodge Challenger parked in Defendant's neighbor's driveway, discussed in detail below, which produced a loaded .40 caliber Taurus pistol, substances later determined to be cocaine and fentanyl, and a black digital scale.  (ECF No. 37 at PageID 66–67.)  Based on this evidence, Defendant was charged with, *inter alia*, possession with intent to distribute a controlled substance (fentanyl and cocaine), in violation of 21 U.S.C. § 841(a)(1); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and possessing said firearm in furtherance of a drug crime, in violation of 18 U.S.C. § 924(c).  (ECF No. 37 at PageID 67; see also Superseding Indictment, ECF No. 22 at PageID 39–40, Counts 1–4.)

Defendant filed a Motion to Suppress and Incorporated Memorandum of Law on February 25, 2022, arguing that the evidence found in the vehicle "must be suppressed."  (ECF No. 37 at PageID 67.)  The Government responded on April 12, 2022.  (ECF No. 49.)  On May 18, 2022,

---

[1] Defendant states in his Motion that the events at issue occurred on April 29, 2021.  (ECF No. 37 at PageID 65.) Based on the record, however, this appears to be a typographical error.  (See e.g., ECF No. 49 at PageID 84; ECF No. 56 at PageID 124, 140, 147, 169; ECF No. 65 at PageID 192–93.)

the Magistrate Judge held a hearing on Defendant's Motion to Suppress.  (ECF No. 54; Tr., ECF No. 56.)  At the Motion Hearing, Probation Officer Jody Poole and Detective Brett Neas each testified for the Government; Defendant also testified.  (See ECF No. 56 at PageID 115.)  The Government introduced four exhibits into evidence: a State of Tennessee Probation Order dated March 5, 2019 (Ex. 1, also docketed as ECF No. 49-1), a Google Maps image (Ex. 4), and two photographs (Ex. 5 and 6).  Defendant introduced two photographs into evidence (Ex. 2 and 3).

Probation Officer Jody Poole has been employed by the Tennessee Department of Corrections for three years and was Defendant's Probation Officer from October 2020.  (ECF No. 56 at PageID 120–21.)  Her duties with respect to Defendant included "supervis[ing] him, drug screen[ing] him, [and] home visits."  (Id. at PageID 122.)  Officer Poole testified that she and her partner, Officer Clay, went to Ewing's residence at 2693 Beechmont Street in Memphis, Tennessee, on April 9, 2021, as part of an operation, because she had "got[ten] wind" that Ewing may have been selling drugs from the driveway of the home.  (Id. at PageID 124–25, 140.)  She stated that they had "six or seven agencies" in various assigned spots for backup and surveillance, including Homeland Security, the Memphis Police Department, and "the drug units."  (Id. at PageID 125, 139, 141.)

Officer Poole testified that due to Covid protocols at the time, she would sometimes interview probationers outside their homes or by telephone and had previously interviewed Ewing outside.  (Id. at PageID 129–30.)  She testified that she had never interviewed anyone from her car.  (Id. at PageID 130.)

Upon arriving at Defendant's address, Officer Poole called Defendant "to ensure that he was home" and "told him to . . . step outside."  (Id. at PageID 126.)  She then saw him exit from the driver's seat of a black 2017 Dodge Challenger that was "in the neighbor's driveway to the

right of the house," at 2695 Beechmont Street; no one else was in the vehicle.  (Id. at PageID 126–127, 131–32.)  Officer Poole testified that she then "told him to come towards [her]" and "started talk[ing] to him," at which "time the other agencies came in."  (Id. at PageID 126.)

Officer Poole testified that on April 9, 2021, she did not know to whom the Challenger was registered.  (Id. at PageID 140.)  She testified that this did not matter, however, as Defendant was a probationer and "was in the driver's seat of [the Challenger]," which "[gave] [her] authority to enter the vehicle under the Probation Order conditions.  (Id. at PageID 136, 140.)  Officer Poole did not, however, personally search the vehicle."  (Id. at PageID 134.)

Detective Brett Neas is a detective with the Shelby County Sheriff's Office PSN division; in April 2021, he was assigned to the Multi-Agency Gang Unit NIBIN division and had been a law enforcement officer for approximately 14 years.  (Id. at PageID 143–44.)  Detective Neas was a part of the operation involving Defendant described above.  (Id. at PageID 144.)  He "was informed that [they] would be doing a probation check on Mr. Ewing at his residence," and his role on that date was to conduct surveillance by "discr[eet][ly] . . . observ[ing] the residence [(at 2693 Beechmont Street)] as officers approached and watch[ing] what happened to the point of officers making contact at the residence."  (Id. at PageID 145, 159.)  He testified that he was parked on Lynnwood Avenue, "just east of Overton Crossing."  (Id. at PageID 146.)  He testified that "from [his] vantage point, [he] was able to see a clear line of sight to 2693 Beechmont Street." (Id.; see also id. at PageID 150.)  Exhibit 4 is a Google Maps aerial image of the intersections of Beechmont Street, Overton Crossing Street, and Lynnwood Avenue and the surrounding area.  A red marker on Exhibit 4 designates 2963 Beechmont Street.  Detective Neas testified that this

4

image "truly and accurately depict[ed]" his location and the house's location on April 9, 2021. (Id. at PageID 146.)

Detective Neas testified that, using binoculars, he "first saw Mr. Ewing immediately after the probation officers pulled up in front of the residence" and that Defendant "exited a vehicle that was parked in the driveway of 2695 Beechmont Street," that is, the 2017 Dodge Challenger. (Id. at PageID 151–52.) After observing Defendant "approach the probation officers" and special agents arrive on the scene, Detective Neas made the scene at Defendant's residence and assisted in the recovery of evidence from the vehicle. (Id. at PageID 153.)

Detective Neas testified that Exhibits 5 and 6 were photographs that he took of 2693 and 2695 Beechmont on a later date. (Id. at PageID 155–59, 162–63.) He testified that Exhibit 5 "was the view that [he] had on April 9[], 2021." (Id. at PageID 146–47.) He also testified that Exhibit 6, taken through the back window of his undercover vehicle, "truly and accurately depict[ed]" his vantage point on that date. (Id. at PageID 147.) He stated that while currently painted gray in the photograph, 2695 Beechmont Street was brown at the time of the April 2021 events, so the photographs depict the same two houses. (Id. at PageID 157–58, 163, 165.)

Detective Neas testified that he did not recall if he ran the temporary tag on the Challenger to see who it belonged to, but he recalled that "the vehicle was found to belong to a female," whose name he did not recall. (Id. at PageID 162.)

Ewing testified that he was in the house when Officer Poole called, not in the Challenger. (Id. at PageID 166–67.) He stated that he exited the house and went down the driveway to Officer Poole, who was in her car, and that it was unusual for him to talk with her in her car. (Id. at PageID 167.) Defendant testified that the Challenger was owned by his sister, Tenetria Ewing, but that he did not know the person to whom it was registered, Shamarian Jackson. (Id. at PageID 169.) He

denied ever having driven it and stated that he did not know who parked it in the driveway.  (Id. at

PageID 168–169.)  He testified that he did not know to whom the evidence recovered from the

vehicle belonged.  (Id. at PageID 170.)

On May 20, 2022, the Magistrate Judge filed a Report and Recommendation as to

Defendant's Motion.  (ECF No. 55.)  Defendant filed timely objections on June 16, 2022 (ECF

No. 65), and the Government responded to those objections on June 23, 2022 (ECF No. 66).

Defendant objects to various findings of fact in the Report and Recommendation, as

discussed below.  The findings of fact to which he does not specifically object are reviewed for

clear error, per the standard below.  As the Court does not find clear error upon review of those

facts, the Court adopts them.  For the sake of brevity, some of those facts are not repeated here.

## II.    LEGAL STANDARD

### A.  Standard of Review

"Within 14 days after being served with a copy of the recommended disposition, a party

may serve and file specific written objections to the proposed findings and recommendations."[2]

Fed. R. Civ. P. 72(b)(2).  "When no timely objection is filed, the court need only satisfy itself that

there is no clear error on the face of the record in order to accept the recommendation."  Fed. R.

Civ. P. 72(b) advisory committee notes.

When a timely objection has been filed, "[t]he district judge must determine de novo any

part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P.

72(b)(3).  The portions of a magistrate judge's recommendation as to which no specific objections

were filed are reviewed for clear error.  See Fed. R. Civ. P. 72(b) advisory committee notes;

Howard v. Sec'y of Health & Human Servs., 932 F.2d 505, 509 (6th Cir. 1991) (noting that when

---

[2] In this case, Defendant moved for and was granted an extension of time in which to file his objections.  (ECF Nos. 59–60.)

a party makes a general objection, "[t]he district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless"). "A general objection to the entirety of the magistrate's report has the same effects as would a failure to object." Howard, 932 F.2d at 509. Moreover, the "failure to properly file objections constitutes a waiver of appeal." See id. at 508 (citing United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)).

## III.   ANALYSIS

Defendant objects to: (1) various findings of fact by the Magistrate Judge (ECF No. 65 at PageID 191–92); (2) the Magistrate Judge's credibility determinations (id. at PageID 193–95); and (3) the Magistrate Judge's proposed conclusion that Defendant lacks standing to challenge the search (id. at PageID 195–200). The Court addresses each of these objections below.

### A.  Findings of Fact and Credibility Determinations

Defendant objects to several of the Magistrate Judge's findings of fact and, relatedly, her decision to credit the testimony of Officer Poole and Detective Neas over that of Defendant. On de novo review, the Court finds the testimony of Officer Poole and Detective Neas to be credible and their testimony supported by the photographic evidence in the case, as discussed below. On the other hand, the Court finds that Defendant's conflicting testimony lacks credibility. The Court therefore adopts the facts from the Report and Recommendation to which Defendant objects.

A trial court has "wide latitude to assess the credibility of witnesses." United States v. Haynes, 301 F.3d 669, 679 (6th Cir. 2022) (citing Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573–75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." United States v. Vaughn, 429 F. Supp. 3d 499, 529 (E.D. Tenn. 2019) (internal citations omitted). "Nonetheless, the court's discretion is not unlimited. A trial court's decision to credit a witness'[s] testimony may be held erroneous on

review if '[d]ocuments or objective evidence . . . contradict the witness'[s] story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" Haynes, 301 F.3d at 679–80 (quoting Anderson, 470 U.S. at 575).

Here, two unbiased witnesses testified readily, consistently, and clearly that they saw Defendant exit the Challenger as his probation officer arrived. Officer Poole testified that after she "pulled up to his address," "called him," and "told him to . . . step outside," Defendant "exited a black Challenger," in which she had seen him seated in the driver's seat, and that this vehicle was "in the neighbor's driveway to the right of the house," at 2695 Beech[mont] Street. (ECF No. 56 at PageID 126–27.) Detective Neas also testified that, "immediately after the probation officers pulled up in front of the residence," he saw Defendant "exit[] a vehicle that was parked in the driveway of 2695 Beechmont Street," which he later identified as the Challenger. (Id. at PageID 151–52.) Detective Neas testified that he had a "clear line of sight to 2693 Beechmont Street" and 2695 Beechmont Street from where he was parked on Lynnwood Avenue. (Id. at PageID 146–47, 150–51; see also id. at PageID 152–53.) He testified that the aerial Google Maps photograph (Exhibit 4) and Exhibits 5 and 6 "truly and accurately depict[ed] [his] vantage point" and location on the day in question. (ECF No. 56 at PageID 147.) Although the photographs were taken at a later date, Detective Neas answered affirmatively when asked under oath if he was "in the same spot as [he] was the day of the arrest when [he] took [the] pictures." (Id. at PageID 162–63.)

The Court finds that the photographs support and align with Detective Neas's testimony that he had an unobstructed view of the driveway in question and, using binoculars (id. at PageID 151–52), saw Defendant exit the Challenger. (See id. Ex. 2–6.) Contrary to Defendant's assertion, these images do not suggest that it "would have been impossible . . . for Neas to have seen Mr. Ewing exit the Challenger from where he was parked on the date in question" due to various

alleged obstructions to his view, including "a fence filled with foliage, telephone poles, another house, a random log, mailboxes, trash cans, . . . [and] the rear defrost lines running through the back window of Neas'[s] vehicle." (ECF No. 65 at PageID 193.) The Court also finds that the alleged omission of mention of the binoculars on the incident report (see id. at PageID 194) does not negate Detective Neas's credibility that he indeed used binoculars on the day in question. Nor does the Court find reason to doubt Detective Neas's explanation of "the inconsistency between his reported weapons violation/felony response and Poole's testimony that she was there for a probation visit" (see id.) as attributable to auto-population of that field of the incident report by the Watson system (see ECF No. 56 at PageID 160–61). This field may have remained auto-populated even if Detective Neas manually completed the rest of the incident report with the particulars of the search. (See id. at PageID 161.) Defendant's argument that Detective Neas's "testimony was inconsistent with his incident report" (see ECF No. 65 at PageID 195) is additionally unconvincing because the Court does not have the incident report before it.

That the two law enforcement witnesses gave testimony that is both internally consistent and consistent with each other provides reason to credit their testimony, along with the Court's interpretation of the photographic exhibits. Defendant refers to Detective Neas's testimony as "self-serving" and asserts that "[t]he fact that he and Pool testified consistently only means that Neas fit his story to match hers." (Id.) These witnesses, however, had no motive to testify falsely, and each testified out of the other's presence. (See ECF No. 56 at PageID 119, 142.) Contrary to Defendant's contention, this is far from "one of those rare cases where the testimony and the other evidence is 'so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" (ECF No. 65 at PageID 195.) (quoting Haynes, 301 F.3d 669, 679 (quoting Anderson, 470 U.S. at 575).)

Moreover, Defendant's testimony, which directly conflicts with that of the two Government witnesses, lacks credibility.  He denies that he was in the Challenger.  (ECF No. 56 at PageID 166–67.)  Despite admitting that the Challenger was owned by his sister, he testified that he did not know who parked the vehicle in the driveway and had never been inside the vehicle.  (Id. at PageID 169–70.)  This story is far-fetched.  Additionally, Defendant is a convicted felon, providing reason to doubt his credibility.

Accordingly, on de novo review, the Court adopts the Magistrate Judge's findings of fact and credibility determinations that Defendant challenges in his Response to the Report and Recommendation.  Pertinently, the Court finds that Defendant was seated in the driver's seat of the Challenger (which belonged to his sister) prior to the search of the vehicle, and that Officer Poole and Detective Neas observed as much.

The Court notes that although Defendant "objects to the proposed finding of fact that states he was allegedly selling drugs from his mother's house" (ECF No. 65 at PageID 191) (citing ECF No. 55 at PageID 96), the Report and Recommendation states only that "[i]n April 2021, [Officer Jody] Poole 'got wind' that Ewing was selling drugs from his mother's house . . . ."  (ECF No. 55 at PageID 96) (quoting ECF No. 56 at PageID 125).  The Court finds on de novo review that Officer Poole testified that she "got wind that [Defendant] was possibly selling from his driveway from his house."  (ECF No. 56 at PageID 125.)  The Court need not find at this time whether in fact Defendant was selling drugs from the driveway or home (nor did the Report and Recommendation attempt to do so); the Court finds that Officer Poole's testimony is credible and establishes that she heard of suspected illegal activity by Defendant prior to her visit that day.

Finally, the Court finds no proof in the record as to whether the Challenger was running prior to the search.  Defendant does not object to the Magistrate Judge's finding that "[t]he

Challenger was not running at the time" of the search.  (ECF No. 55 at PageID 65.) (See also ECF No. 55 at PageID 108.)  To the contrary, in his Motion, Defendant asserts that "the Challenger was not running at that time."  (ECF No. 37 at PageID 66.)  The witnesses who testified at the hearing, however, made no mention of whether or not the vehicle was turned on, and neither Party submitted the incident report that allegedly stated that the vehicle was running at the time.  (See generally ECF No. 55; ECF No. 37 at PageID 66.)  Thus, the Court cannot adopt the Magistrate Judge's finding that the Challenger was not running at the time of the search.  As discussed below, however, whether the vehicle was turned on is immaterial to the issues of standing and whether the search in question was reasonable.

    *B. Constitutional Validity of Search*

        i.    Standing

Defendant additionally objects to the Magistrate Judge's "proposed conclusion that he does not have standing to challenge the search."  (ECF No. 65 at PageID 195.)  He argues that "if the finding is that he was in the vehicle, then he has standing to challenge the search."  (Id.)  Defendant argues that "if he was seated in the driver's seat of his sister's vehicle," he has standing to contest the vehicle's search under the "lesser known trespassory test" articulated in United States v. Jones, 565 U.S. 400 (2012).  (ECF No. 65 at PageID 197.) ("[A] search occurs when the government 'physically occup[ies] private property for the purpose of obtaining information.'") (quoting Jones, 565 U.S. at 404.)  Defendant additionally contends that "[a]s a permissive user of his sister's vehicle and the alleged sole occupant at the time, Mr. Ewing had possession and control over the vehicle and had the right to exclude," thereby conferring standing under Byrd v. United States, 138 S.Ct. 1518, 1527–28 (2018).  (ECF No. 65 at PageID 198.) The Government makes no response on the issue of standing.

"Fourth Amendment rights are said to be 'personal[,]' [s]o a defendant must show that 'his own' rights were 'infringed.'" United States v. Russell, 26 F.4th 371, 374 (6th Cir. 2022) (quoting Rakas v. Illinois, 439 U.S. 128, 133 (1978); Byrd, 138 S. Ct. 1518, 1526 (2018)). "Courts use 'standing' as a 'shorthand' for this requirement." Id. (quoting Byrd, 138 S. Ct. at 1530). "[A] defendant has standing only if he has a Fourth Amendment interest in the property searched." Id. at 377 (citing Byrd, 138 S. Ct. at 1530). "This interest can either be a property or a privacy interest." Id. (citing Byrd, 138 S. Ct. at 1526). The defendant "has the burden of establishing his standing to assert a Fourth Amendment violation." United States v. Smith, 263 F.3d 571, 582 (6th Cir. 2001) (citing United States v. Salvucci, 448 U.S. 83, 86 (1980)).

The Magistrate Judge found that "under the facts as found by the Court—that Ewing was inside the Challenger—he cannot establish standing when he was merely sitting in the driver's seat of the car he does not own while parked in his neighbor's driveway." (ECF No. 55 at PageID 108.) (citing United States v. Taylor, 496 F. Supp. 2d 852, 857 (S.D. Ohio 2006).)

That a defendant does not own the vehicle that was searched does not defeat his standing. In Byrd, the Court held that, generally, "someone in otherwise lawful possession and control of a rental car [or a car privately owned by another person] has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." 138 S. Ct. at 1524, 1528. A "property-based concept guide[d] resolution of [that] case": that either ownership or lawful[3] possession or control of the property searched "will in all likelihood" create "a legitimate expectation of privacy by virtue of the right to exclude." Id. at 1527 (quoting Rakas, 439 U.S. at 144 n.12). In holding that Byrd would have a privacy interest in the vehicle if his possession and

---

[3] "The central inquiry at this point turns on the concept of lawful possession . . . . No matter the degree of possession and control, [a] car thief would not have a reasonable expectation of privacy in a stolen car." Byrd, 138 S.Ct. at 1529.

control were found to be lawful on remand, the Court noted that "this case . . . involve[d] . . . the driver and sole occupant of a rental car." Id. at 1528.

The older Ohio district court case cited by the Magistrate Judge relied on pre-Byrd case law to find that for a non-owner driver of a vehicle to have had a reasonable expectation of privacy in the vehicle, he "must demonstrate that he obtained possession from the owner of the vehicle or someone authorized by the owner to give him possession of the vehicle." Taylor, 496 F. Supp. 2d at 856. The Court reads this requirement as now subsumed within the "lawfulness" qualification from Byrd. Our sister circuit has held, however, that "[a] non-owner driver may be presumed to have permission to use the vehicle unless there is evidence 'tending to show that he was illegitimately in possession of [the vehicle].'" United States v. Ghazaryan, 685 F. App'x 222, 223 (4th Cir. 2017) (quoting United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992)). Here, unlike in Byrd, there has been no argument by the Government, or other proof, that Ewing unlawfully obtained use of his sister's car. Accordingly, the Court finds that Defendant's presence in the driver's seat and as the vehicle's sole occupant, as a presumed permissive user, establishes sufficient lawful possession and control to bring with it the attendant right to exclude and, thus, reasonable expectation of privacy in the vehicle. The circumstances—Ewing's being alone in the driver's seat of his sister's car—demonstrate more than just "legitimate presence on the premises of the place searched," which, the Byrd Court noted is, "standing alone, [] insufficient" to create the required reasonable expectation of privacy to establish standing. Byrd, 138 S. Ct. at 1527 (citing Rakas, 439 U.S. at 142). Likewise, the Court finds that whether the car was running or turned off has no bearing on Ewing's possession and control over, and thus expectation of privacy in, the vehicle.

In sum, the Magistrate Judge erred in finding that Defendant lacks standing to assert a Fourth Amendment violation based on the search of the Challenger, and that portion of the Report and Recommendation is REVERSED.  Nevertheless, the "standing" inquiry in the Fourth Amendment context "is not distinct from the merits and 'is more properly subsumed under substantive Fourth Amendment doctrine.'"  Id. at 1530 (citing Rakas, 439 U.S. at 139).  In remanding the case, the Byrd Court noted that the lower court was "not required to assess Byrd's reasonable expectation of privacy in the rental car before . . . addressing whether there was probable cause for the search."  Id. at 1530–31.  Thus, even if it had not first addressed standing, this Court may, and now does, address the merits of the reasonableness of the search at issue.

  ii.  <u>Reasonableness of Search</u>

The Magistrate Judge found it unnecessary to resolve the issue of the legality of the search of the Challenger, as she found that "Ewing had not established that he has standing to challenge the search."  (ECF No. 55 at PageID 107.)  In his objections, however, Ewing argues that "the search was illegal" because the officers "had no probable cause to believe the Challenger was owned or controlled by Mr. Ewing."  (ECF No. 65 at PageID 200.)

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  When a search is determined to have been unreasonable, "the exclusionary rule exists to suppress evidence gained through unconstitutional means."  United States v. Rodriguez-Suazo, 346 F.3d 637, 644 (6th Cir. 2003) (citing United States v. Calandra, 414 U.S. 338, 348 (1974); Nix v. Williams, 467 U.S. 431, 443 (1984)).  "It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few

14

specifically established and well-delineated exceptions." United States v. Trice, 966 F.3d 506, 512 (6th Cir. 2020) (quoting Morgan v. Fairfield Cnty., 903 F.3d 553, 560–61 (6th Cir. 2018) (cleaned up) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973))).

Searches involving probationers provide an exception to the general prohibition against warrantless searches, as such individuals, "by virtue of their status alone, [] do not enjoy the absolute liberty to which every citizen is entitled." Samson v. California, 547 U.S. 843, 848–49 (2006) (quoting United States v. Knights, 534 U.S. 112, 119 (2001) (further internal citations and internal quotation marks omitted)). The Supreme Court has explained that "[w]hether a search is reasonable [as examined under the totality of the circumstances] 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. at 848 (quoting Knights, 534 U.S. at 118–19) (internal quotation marks omitted in original)).

In Knights, the defendant's probation order required him, as a probationer, to "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." 534 U.S. at 114. The Court noted that the probation order "clearly expressed the search condition and Knights was unambiguously informed of it," and thus held that the "probation condition [] significantly diminished Knights' reasonable expectation of privacy." Id. at 119–20. Weighing this against the governmental interests involved,[4] the Court held that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on

---

[4] These "dual" interests include the "hope that [a probationer] will successfully complete probation and be integrated back into the community" and the "concern, quite justified, that [the probationer] will be more likely to engage in criminal conduct than an ordinary member of the community." Knights, 534 U.S. at 120–121.

the probationer's significantly diminished privacy interests is reasonable" and a warrant requirement is thus unnecessary.  Id. at 121.  In Samson, the Court addressed, in the context of a parolee search,[5] "whether the search [in Knights] would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation."  547 U.S. at 850. Based on a similar balancing inquiry, the Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee."  Id. at 857.

More recently, the Sixth Circuit extended Knights and Samson to hold that "a probationer whose probation order contains a search condition may be subjected to a search in the absence of reasonable suspicion."  United States v. Tessier, 814 F.3d 432, 433 (6th Cir. 2016).  In Tessier, the Sixth Circuit "adopted the . . . reasoning" of the district court.  Id.  The district court relied on the balancing test from Knights and Samson and found that, although the defendant's probation order mentioned only warrantless search and not search "with or without reasonable cause," requiring reasonable suspicion would be "too-cabined a reading of, 'I agree to a search, without a warrant,'" as such language informs probationers "that judicial preview is not necessary before a search can occur."  United States v. Tessier, No. 3:13-00077, 2014 WL 4851688, *7 (M.D. Tenn. Sept. 29, 2014) (internal citations omitted).

In his Motion, Defendant admits that "[c]ourts in both the Sixth Circuit and the State of Tennessee have found the Fourth Amendment will tolerate the exact search provision in Mr. Ewing's Probation Order because the state has an interest in reducing recidivism and promoting reintegration of probationers."  (ECF No. 37 at PageID 68.) (citing Tessier, 814 F.3d at 433–34; State v. Hamm, 589 S.W.3d 765, 777 (Tenn. 2019).)  Defendant also does not dispute that this provision authorizes a suspicionless search of the enumerated property.  (See id.)  Defendant,

---

[5] The Samson Court noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."  Samson, 547 U.S. at 850.

however, contends that "[t]he search in this case . . . was not within the scope of Mr. Ewing's
Probation Order" because "Mr. Ewing was not seen in the vehicle."   (Id. at PageID 68–69.)
Defendant contends that "there is no set of circumstances supporting the search of a vehicle in the
driveway of a different home," as "[t]here is no legitimate governmental interest served in allowing
law enforcement officers to search vehicles parked in random driveways that just happen to be
located near a probationer's home." (Id. at PageID 69.)  Ewing's Motion does not address the
legality of the search if Ewing was in fact in the Challenger.  (See generally ECF No. 37.)

       During the hearing, Defendant questioned the legitimacy of the "very, very broad,
enhanced search provision" in the probation order that would, according to the Government, allow
suspicionless search of a "car [] parked at a different address." (ECF No. 56 at PageID 175–77.)
Defendant urged the Court to distinguish Tessier based on language in Tessier's probation
conditions that was not present in Ewing's conditions.  (Id. at PageID 175.)  As noted by Judge
Siler in concurrence in Tessier, Tessier's conditions form contained the language, "I understand
that if I do not agree with any condition, I have the right to petition the Sentencing Court for a
modification. Any release from these instructions will be provided to me in writing."  814 F.3d at
436 (Siler, J., concurring).  According to Defendant's interpretation of Judge Siler's opinion, this
qualification allowed the search condition to "pass[] [] constitutional muster" because it indicated
that Tessier was "aware of it" and "underst[ood] it." (ECF No. 56 at PageID 175.)  Defendant
asserted that "if [Ewing] didn't get out of the car[,] [] we shouldn't be expanding on an already
very expansive, broad, enhanced search policy."  (Id. at PageID 177.)  He also contended, in
response to questioning by the Court, that if the proof were to show that Ewing did get out of the
car, "that would expand [the search] out of constitutional protection," although he acknowledged
that this "would be a very difficult posture to take." (Id. at PageID 177–78.)

Having considered the <u>Tessier</u> concurrence, the Court does not find that case distinguishable based on the language in the search conditions. While Ewing's conditions did not provide for an opportunity of modification, both Ewing and Tessier knowingly signed their search conditions providing for warrantless searches, thereby demonstrating their understanding "that judicial preview is not necessary before a search can occur." <u>Tessier</u>, 2014 WL 4851688, at *7 (internal citations omitted). Additionally, having determined that Ewing in fact got out of the car, the Court need not address whether Ewing's search conditions would be overly broad as applied to the car parked in his neighbor's driveway.

In his objections to the Report and Recommendation, Ewing expands on his argument that the search was unlawful even if he was in the Challenger. He contends that "before the police could search the Challenger without a warrant or probable cause, they had to have a sufficient basis to believe that Mr. Ewing owned or controlled that vehicle." (ECF No. 65 at PageID 199.) (citing <u>United States v. Dixon</u>, 984 F.3d 814, 822 (9th Cir. 2020).) He asserts that the officers "had no probable cause to believe the Challenger was owned or controlled by Mr. Ewing and therefore, the search was illegal." (<u>Id.</u> at PageID 200.)

In <u>Dixon</u>, the Ninth Circuit held that "before conducting a warrantless search of a vehicle pursuant to a supervised release condition, law enforcement must have probable cause to believe that the supervisee owns or controls the vehicle to be searched." <u>Dixon</u>, 984 F.3d at 822. This standard, the Court explained, combats "the risk of officers conducting intrusive searches on vehicles that have no connection to the individual subject to the search condition." <u>Id.</u> By contrast, the Court reasoned, a reasonable-suspicion standard "would place innocent third parties at heightened risk of having their vehicles searched . . . ." <u>Id.</u>

As Defendant contends, "[t]he Sixth Circuit has not [yet] addressed the level of suspicion required to determine whether a vehicle is subject to a warrantless search condition." (ECF No. 65 at PageID 199.) The search in this case, however, would satisfy even the Ninth Circuit's probable-cause requirement. While Defendant invokes the facts from <u>Dixon</u> to support his argument (<u>see id.</u>), <u>Dixon</u> is distinguishable based on those very facts. In that case, "Dixon attested that the police initially confused his minivan with another parked next to it, and that they also threatened to break into a nearby Audi." <u>Dixon</u>, 984 F.3d at 822. Additionally, the officer only "confirm[ed] that [Dixon] exercised control over the minivan" that was searched "when they inserted the key that Dixon had dropped into the car lock," which the Court held to be itself a search subject to the probable-cause requirement discussed above. <u>Id.</u> at 819–20. Here, in contrast, law enforcement would have acquired probable cause to believe that Ewing controlled the Challenger before any search occurred, when they observed him exit the driver's seat of the vehicle. Under these circumstances, there was no risk of conducting a search of a vehicle that bore "no connection to the individual subject of the search condition." <u>Id.</u> at 822.

Moreover, it appears that the search of the Challenger was not a "suspicionless search." As noted, the Court credits Officer Poole's testimony that she "got wind" that Defendant was potentially selling drugs from the driveway of his house. (ECF No. 56 at PageID 125.) Although the Challenger was parked in the neighbor's driveway, Defendant's presence in the driver's seat, the car's proximity to Defendant's house, and Officer Poole's prior knowledge of Defendant's potential drug sales likely provided reasonable suspicion for a search of that vehicle. It is not necessary to make a final determination on this issue, since the Defendant was subject to an applicable search condition as a result of the Probation Order. <u>Tessier</u>, 814 F.3d at 433. (<u>See</u> <u>also</u> Probation Order, ECF No. 49-1 ¶ 7.)

19

For the reasons stated above, the Court finds that the search of the Challenger was reasonable; Defendant's Motion to Suppress is, therefore, DENIED.

      iii.     Good-faith exception

Finally, the Magistrate Judge found that if Ewing were determined to have standing, and the search of the Challenger were determined to be unreasonable, the good-faith exception would not apply to "save the evidence obtained from the Challenger from suppression." (ECF No. 55 at PageID 109–112.) No objection has been made to this finding, and the Court finds no clear error upon review. Accordingly, the Report and Recommendation is ADOPTED with respect to its discussion of the good-faith exception.

## IV.    CONCLUSION

Upon de novo review, the Court ADOPTS the Report and Recommendation of the Magistrate Judge with respect to the findings of fact and credibility determinations discussed above. To the extent that the Report and Recommendation finds that Defendant does not have standing to contest the search of the Challenger, the Report and Recommendation is REVERSED. The search did not violate Defendant's Fourth Amendment rights, however, and Defendant's Motion to Suppress is therefore DENIED.

      **IT IS SO ORDERED**, this 14th day of July, 2022.

                         /s/ Jon P. McCalla
                        JON P. McCALLA
                        UNITED STATES DISTRICT JUDGE